### IN THE UNITED STATES DISTRICT COURT FOR
### THE WESTERN DISTRICT OF LOUSIANA
### LAKE CHARLES DIVISION

| | |
|---|---|
| Cedric Williams, individually and on behalf of all others similarly situated,<br><br><br>                                  Plaintiffs,<br>v.<br><br>Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC,  Instagram, LLC, Siculus, Inc.,<br><br>                                  Defendant. | Case NO.: _____<br><br>**CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL** |

Plaintiff Cedric Williams, individually, and on behalf of all others similarly situated, on personal knowledge with respect to facts pertaining to them, and upon information and belief as to other matters, bring this Complaint against Defendants, Meta Platforms, Inc. ("Meta") and all it's subsidiaries ("Defendants") ,  and alleges:

### <u>INTRODUCTION</u>

1.      Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the

1

platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyber-bullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.      This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.      Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.      Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote

3

problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.     A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.     Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data

4

profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.      Over the past decade or so, Meta has added features and promoted the use of auto playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.      Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.      Plaintiff brings all claims in this action on behalf of himself and a class of individuals defined as "All persons who used Facebook and suffered mental health issues as a result of the use of the Facebook Platform".

12.      Plaintiff brings claims of strict and products liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

13.      Plaintiff also brings claims for strict and products liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

5

14.    Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to protect or re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

15.    The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by users, but especially minor users and their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

6

17.     This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Louisiana and purposely avail themselves of the benefits of transacting business with Louisiana residents. Plaintiff's claims set forth herein arise out of or relate to Defendants' activities in the State of Louisiana and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

18.     Defendants interface with a significant percentage of the population of the State of Louisiana relating to use of the products at issue in this case, and interact extensively with— send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Louisiana.

19.     Defendants advertise extensively in Louisiana, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers, providers, and retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Louisiana for whom those devices are intended.

20.     Defendants have earned millions of dollars in annual revenue from their Louisiana related activities over the last several years arising from their defective and inherently dangerous social media products by Louisiana residents, including Plaintiff.

21.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Western District of Louisiana.

## PARTIES

### Plaintiff

22.    Plaintiff Cedric Williams is an adult individual residing in Sulphur, Louisiana.

### Defendant Meta Platforms, Inc.

23.    Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

24.    Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

### Subsidiary Defendants

25.    Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a

holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

26.    Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

27.    Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

28.    Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

29.    Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

30.    Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## GENERAL FACTUAL ALLEGATIONS

31.    Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing

during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

32.    Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

33.    The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants failed to design their products with sufficient protections to account for and ameliorate the psychosocial immaturity of their minor users.

34.    Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and

are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

35.    Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

36.    One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "down regulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates.

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (September 6, 2022, last visited at 8:44 AM PST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

37.     Eventually, as this pattern continues over a period of days, weeks, or months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

38.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

        a. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

        b. Tolerance, the need to spend more time using social media to satisfy the urge.

        c. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

        d. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

        e. Continuing to use social media despite problems.

f. Deceiving family members or others about the amount of time spent on social media.

g. The use of social media to relieve negative moods, such as guilt or hopelessness. And

h. Jeopardizing school or work performance or relationships due to social media usage.

39.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

40.     Defendants' products could feasibly report the frequency and duration of their minor users' screen time to parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

41.     Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people may not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyber-bullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms'

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Medi a_Comparisons_and_Self-Esteem

progressively toxic environment worsened by its 2018 shift to engagement-based ranking, discussed in further detail below.

42.     The dangers associated with teenagers' proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

43.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

44.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimize the balance of negative and positive feedback signals to addict users.

45.     Other psychological manipulations used to intertwine social media users include: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos; (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

46.     Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under

which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

47.    Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

48.    Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

49.    Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where authors published content. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated

18

recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

50.    Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to

engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

51.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

52.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

[7] Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited September 6, 2022).



53.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

54.     Upon information in belief, at least as far back as 2019, Meta initiated, inter alia, a Proactive Incident Response experiment, which began researching the effect of Meta on the

mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

55.    Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files11631713039?mod=bigtop-breadcrumb

otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

56.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

57.     Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

58.     Meta professes to have implemented protective measures to counteract the well established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage

users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

59.    Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products and negligent operation of that platform, not as the speaker or publisher of third-party content.

60.    Plaintiff alleges that Defendants failed to protect or warn users, including minors and their parents, of known (by Defendants) dangers from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for Defendants' own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

61.    Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

62.    None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for Defendants' speech and silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## CLASS ALLEGATIONS

63.     Plaintiff Cedric Williams is a thirty-year-old man who is a heavy user of the Meta platform(s).

64.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). Plaintiff's interest in any activity, other than viewing and posting on the Meta platform(s), progressively declined.

65.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) constantly pushed to Plaintiff, Plaintiff began getting less and less sleep.

66.     As a proximate result of his addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to Plaintiff, Plaintiff subsequently developed injuries including loss of relationships, depression, social anxiety, and a reduced inclination or ability to sleep.

67.     Defendants designed the Meta platforms(s) to allow users, like Plaintiff and class members, to become addicted to and abuse their products, without their consent, and in the case of minors, without the consent of the users' parents.

68.     Defendants specifically designed the Meta platform(s) to be attractive nuisances to users, including minors, but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on users, especially minor users, that access the Meta platform(s).

69.     Plaintiff and class members were not aware of the clinically addictive and mentally harmful effects of Meta platform(s) when Plaintiff began to use the products.

70.     Defendants not only failed to warn Plaintiff and class members of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but also misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.     As a result of Plaintiff's and class member's extensive use of the Meta platform(s), they have developed numerous mental health conditions, some of which have become chronic.

## CAUSES OF ACTION UNDER LOUISIANA LAW

72.     The injuries and damages alleged herein that are specific to Louisiana law were caused by Defendants' violations of the Louisiana Products Liability Act, LSA-R.S. 9:2800.54, et seq.   Specifically, Defendants are manufacturers or the Facebook and Instagram products, which violations include the following:

a.   Manufacturer of product that was unreasonably dangerous in construction or composition when it left Defendants' control, pursuant to LSA-R.S. 9:2800.55;

b.   Manufacturer of a product that was unreasonably dangerous in design, when there existed an alternative design(s) of said product, with the gravity of the unreasonably dangerous design outweighing the burden on Defendant of adopting an alternative design, pursuant to LSA-R.S. 9:2800.56;

c.   Manufacturer of an unreasonably dangerous product because Defendants failed to provide an adequate warning regarding characteristic(s) of the product that could cause the damage suffered, pursuant to  LSA-R.S. 9:2800.57; and

d.    Manufacturer of an unreasonably dangerous product because Defendants made

representations, statements of fact or promise, and warranties to consumers with respect to the product regarding its claimed qualities and level of performance so as to induce the sale and use (and overuse) of said product, which express warranty was untrue, pursuant to  LSA-R.S. 9:2800.58.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY - DESIGN DEFECT

73.    Plaintiff and class members incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

74.    Plaintiff and class members plead all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of named Plaintiff's resident state. Plaintiff and class members plead this Cause of Action under all applicable product liability acts, statutes, and laws of named Plaintiff's respective state.

75.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff and class members used.

76.    Facebook and Instagram were designed and intended to be used as social media platforms.

77.    Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD,

27

difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

78.    Defendants defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

79.    Defendants effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

80.    Defendants defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (i.e., photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

81.    Defendants defectively designed the platforms and Defendants failed to test as to the safety of features they developed and implemented for use in the platforms. Once Defendants did perform some product testing and had knowledge of ongoing harm to Plaintiff and the class, they failed to adequately remedy the product defects or warn of the defects.

82.    Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

83.    The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

84.    Defendants could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

85.    Defendants could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time. Instead, Defendants designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff and the class.

86.    Defendants could have used technology to protect youth or enable user-level access restrictions so that use was tied to a user's age verification, restricting those under-aged from using the platforms.

87.    Defendants could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including:

    a.    Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

b.    Default protective limits to length of use, frequency of use, or content types;

c.    Opt-in restrictions to length of use, frequency of use, or content types;

d.    Session time limits;

e.    Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.    Session time notifications, warnings, or reports;

g.    Warning of health effects of use and extended use upon sign-up;

h.    Parental controls;

i.    Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.    Self-limiting tools;

k.    Implementing labels on images and videos that have been edited through the platform;

l.    Age-based content filtering;

m.    General content filtering;

n.    Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (e.g., content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.   Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.   Chronological presentation of content rather than algorithmic; and

t.   Many other less harmful alternatives.

88.   Instead, Defendants designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

89.   It is reasonable for parents to expect that social media products that actively promote their platforms to users, including minors, will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who

are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

90.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances.

91.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

92.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

93.    The combined result of these features is to present to users a false reality—it presents to users a world that is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more

successful or competent than the user; and that facilitate and encourage harmful behaviors such as self-harm and eating disorders.

94.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop as possible.

95.     Defendants failed to design the product with adequate warnings about the likely harms of use.

96.     Plaintiff and class members used Facebook and Instagram as intended or in reasonably foreseeable ways. Defendants specifically intended for users, including minors, to use its products, and Defendants were aware that users were doing so.

97.     Plaintiff's and class members' injuries—physical, emotional, and economic— were reasonably foreseeable to Defendants at the time of the products' design, marketing, and operation.

98.     Facebook and Instagram were defective and unreasonably dangerous when they left Defendants' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff and class members, who used the products without any substantial change in the products' condition.

99.     Plaintiff and class members were injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's and class members' harms.

100.    Plaintiff and class demand judgment against Defendants for compensatory, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION STRICT LIABILITY
## FAILURE TO WARN

101.    Plaintiff and the proposed class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

102.    Plaintiff and the proposed class plead all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of named Plaintiff's resident state. Plaintiff and class plead this Cause of Action under all applicable product liability acts, statutes, and laws of named Plaintiff's respective state.

103.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff and class members used.

104.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

105.    Defendants were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted

at the time of design, development, coding, dissemination, public release, and operation of platforms.

106.    Facebook and Instagram are defective because, among other reasons described herein, Defendants failed to warn consumers, including Plaintiff and class members, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to Defendants' own research:

      a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

      b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

      c.    Facebook makes body-image issues worse for one-third of girls;

      d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

      e.    Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

      f.    Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

107.    Facebook and Instagram are also defective for failing to warn users that:

      a.    Engagement-based ranking and intermittent variable rewards are

           i.    highly addictive,

           ii.    promote harmful social comparison,

           iii.    promote negative, controversial, and/or emotionally activating content,

      iv.      promote negative, harmful, and dangerous interest groups or content creators,

      v.      encourage bullying and conflict,

      vi.      can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

      vii.      present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.      Face tracking and augmentation (image and video filters);

      i.      inflict unrealistic and biased beauty standards upon users,

      ii.      cause harmful social comparison based on a misleading curation of peers' appearances and success,

c.      The platforms cause the mental and physical health harms as listed above;

d.      The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.      The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.      The likelihood and intensity of these harmful effects are increased by other features and inner workings of the platforms which are currently publicly unknown and hidden from users and governments.

108.    Through their incredible power as the premier social media company (and/or association with that company), Defendants have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

109.    Rather than warning users of likely harms, Defendants regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

110.    The failure of Defendants to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that was reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

111.    Ordinary consumers would not be expected to have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to Defendants.

112.    Defendants are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

113.    Plaintiff and class members could not have averted injury through the exercise of reasonable care for reasons including Defendants' concealment of the true risks posed by Facebook and Instagram.

114.    The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left Defendants' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff and class members. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

115.    At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate

information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

116.    Plaintiff and class members were injured as a direct and proximate result of Defendants' failure to warn and instruct because they would not have used or signed up on Facebook and Instagram had they received adequate warnings and instructions that they could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including loss of relationships, attempted suicide, multiple periods of suicidal ideation, and depression, among other harmful effects.

117.    Instead of providing warnings at sign-up or during use, Meta provided no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The

---

[10] https://www.facebook.com/safety/youth

[11] Id.

website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

118.    The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

119.    The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

120.    Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says:

Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . .Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

121.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The guide is devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

122.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

123.    The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause or a substantial contributing factor in causing the harm to Plaintiff and class members.

124.    Plaintiff and class members demand judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**THIRD CAUSE OF ACTION**
**DEFECT IN MANUFACTURING**

125.    Plaintiff and proposed class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

126.    Plaintiff and proposed class plead all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of named Plaintiff's resident State. Plaintiff and proposed class plead this cause of action under all applicable product liability acts, statutes, and laws of named Plaintiff's respective State.

127.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff and class members used.

128. Defendants actively controlled the Facebook and Instagram platforms during the entire period Plaintiff and class members used them, as Defendants expected.

129. Plaintiff and class members used Facebook and Instagram while they were actively controlled by Defendants, and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

130. Plaintiff and class members used Facebook and Instagram in a manner intended or foreseeable to Defendants.

131. Facebook and Instagram contained manufacturing defects as developed by Defendants and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

132. Without limitation, examples of Defendants' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.    Failure to follow Good Manufacturing Practices ("GMPs");

    b.    Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.    Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.    Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.    Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

      f.      Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

      g.      Failure to test and research the actual user health impact cause by the interaction of the algorithm and other harm causing features listed above;

      h.      Failure to test the platforms' output to users given various user inputs;

      i.      Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

133.    Plaintiff and class members were injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

134.    The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's and class members' harms.

135.    Plaintiff and class members demand judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION**
**<u>FAILURE TO WARN</u>**

136.    Plaintiff and proposed class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

137.    Plaintiff and proposed class plead all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of named Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of named Plaintiff's respective State.

138.    At all relevant times, the Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

139.    The Defendants knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff and class members in a reasonably foreseeable manner, particularly with minors and young adults.

140.    The Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff and class members would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

141.    The Defendants knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

142.    The Defendants owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

143.    The Defendants breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

    a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.    Facebook makes body-image issues worse for one-third of girls;

    d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.    Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.    Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

144.    Facebook and Instagram are also defective for failing to warn users that:

    a.    Engagement-based ranking and intermittent variable rewards are:

        i.    highly addictive,

        ii.    promote harmful social comparison,

        iii.    promote negative, controversial, and/or emotionally activating content,

45

       iv.     promote negative, harmful, and/or dangerous interest groups and/or content creators,

       v.     encourage bullying and conflict,

       vi.     can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

       vii.     present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.     Face tracking and augmentation (image and video filters):

       i.     inflict unrealistic and biased beauty standards upon users, and

       ii.     cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.     The platforms cause the mental and physical health harms as listed above;

d.     The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.     The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.     The likelihood and intensity of these harmful effects are increased by other features and inner workings of the platforms, which are currently publicly unknown and hidden from users and governments.

145.    The failure of Defendants to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a

danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

146.    Through their incredible power as the premier social media company (or association with that company), Defendants silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

147.    Rather than warning users of likely harms, Defendants regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

148.    The failure of Defendants to adequately warn about its defective products— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

149.    At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

150.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

151.    Plaintiff and class members were injured as a direct and proximate result of Defendants' failure to warn and instruct because they would not have used Facebook and Instagram had they received adequate warnings and instructions that the platforms could cause

social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

152.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff and class members.

153.    Plaintiff and class members demand judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## NEGLIGENCE AND GROSS NEGLIGENCE

154.    Plaintiff and proposed class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

155.    Plaintiff and proposed class plead all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of named Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of named Plaintiff's respective State.

156.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and benefited from Facebook and Instagram and the data it collected on users from

these sources, and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

157.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted, or if user data was negligently used.

158.    Defendants had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, collecting, marketing, advertising, promoting, supplying, disseminating and making publicly available the platforms and user data to avoid causing harm to those that used Facebook and Instagram.

159.    Defendants knew or should have known by the exercise of reasonable care, the risks to users and their data of the platforms, of mental and physical health harms.

160.    Defendants knew or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

161.    Defendants knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram thru targeted user data was dangerous, harmful and injurious when used by Plaintiff and class members in a reasonably foreseeable manner, particularly with minors and young adults.

162.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff and class members would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram, when using user data to determine feeds of information are highly addictive and likely to cause mental and physical injuries as listed above.

163.    Defendants knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression,

49

body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

164.    Defendants knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

165.    Defendants knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

166.    Defendants knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately

harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

167.    Defendants knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

168.    Defendants knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and emotionally charged content causing harm to users.

169.    Defendants knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world that is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful or competent than the user; and that will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

170.    Defendants knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of

repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

171.    Defendants knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

172.    Defendants were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff and class members, thereby causing Plaintiff and class members to suffer harm.

173.    The negligence and extreme carelessness of Defendants includes:

a.    Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

b.    Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

c.    Failure to take reasonable care in the design of Facebook and Instagram;

d.    Failure to use reasonable care in the production/development of Facebook and Instagram;

e.    Failure to use reasonable care in the operation of Facebook and Instagram;

f.    Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g.    Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h.      Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i.      Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (i.e., photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.      Use of a design, engagement-based ranking and intermittent variable rewards that Defendants knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

53

k.   Use of design features that Defendants knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.   Use of design features that Defendants knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.   Use of design features that Defendants knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n.   Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

54

o.    Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p.    Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q.    Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r.    Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s.    Failure of Defendants to verify the age of consumers creating accounts and using Facebook and Instagram;

t.    Failure to recall Facebook and Instagram;

u.    All other failures, acts and omissions set forth herein.

174.    Defendants' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff and class members.

175.    Defendants acted or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff and the class, and their acts and omissions had a

55

great probability of causing significant harm and in fact resulted in such harm to Plaintiff and the class.

176.    Based on their strategic and intentional promotion, advertising and marketing history, Defendants reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, Defendants reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

177.    Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

178.    Plaintiff and the class were injured as a direct and proximate result of negligence and gross negligence as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, difficulty sleeping, among other harmful effects, which may cause or contribute to additional disease.

179.    Defendants' negligence and gross negligence were a substantial factor in causing and or contributing to Plaintiff's and class members' harms.

180.    Plaintiff and class members demand judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## <u>FRAUD</u>

181.    Plaintiff and proposed classes incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

182.    Plaintiff and proposed class plead all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of named Plaintiff's resident state. Plaintiff and proposed class plead this Cause of Action under all applicable product liability acts, statutes, and laws of named Plaintiff's respective state.

183.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), collected, marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff and class members.

184.    Defendants' marketing, promotions, and advertisements contained deceptive and misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, through the collection of user data and targeted algorithms, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

---

[13]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

57

185.    Defendants' marketing, promotions, and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

186.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions, and advertising of Facebook and Instagram as positive for users mental and physical health.

187.    Defendants represented to Plaintiff and class members—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

a.    Facebook and Instagram were safe and were not harmful;

b.    Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

c.    Long-term, frequent, prolonged use was harmless;

d.    Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

e.    An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

f.    Other misrepresentations described herein.

188.    Defendants omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

g.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

h.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

i.  Facebook makes body-image issues worse for one-third of girls;

j.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

k.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

l.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

189.  Meta also omitted/failed to inform users that, as it knew or should have known:

m.  Engagement-based ranking and intermittent variable rewards are:

    i.  highly addictive,

    ii.  promote harmful social comparison,

    iii.  promote negative, controversial, and emotionally activating content,

    iv.  promote negative, harmful, and dangerous interest groups and content creators,

    v.  encourage bullying and conflict,

    vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.     present a false reality (regarding one's comparative status to their peers, and the general state of world or political affairs);

    n.     Face tracking and augmentation (image and video filters):

        i.     inflict unrealistic and biased beauty standards upon users, and

        ii.     cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    o.     The platforms cause the mental and physical health harms as listed above;

    p.     The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

    q.     The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

190.    These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

191.    The above representations were communicated to Plaintiff and class members.

192.    Through their incredible power as the premier social media company (and association with that company), Defendants have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

193.    Defendants' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff and class members. Reasonable consumers, including the Plaintiff and class members, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's and class members' decisions to purchase and consume Facebook and Instagram.

194.    Defendants owed Plaintiff a duty to disclose these facts because they were known or accessible exclusively to Defendants, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

195.    Plaintiff and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

196.    Defendants knew or should have known that its misrepresentations and omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

197.    Defendants' misrepresentations and omissions were a substantial factor in causing Plaintiff's and class members' harms. Plaintiff and class members were injured as a direct and proximate result of Defendants' fraudulent conduct as described herein.

198.    Plaintiff and class members demand judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF LOUISIANA UNFAIR**
**TRADE PRACTICES AND CONSUMER**
**PROTECTION LAW ("LUTPA")**

199.    Plaintiff and the proposed class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

200.    Plaintiff and the proposed class plead all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of named Plaintiff's resident state. Plaintiff and proposed class plead this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective state.

201.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff and class members.

202.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and unfair business practices under applicable state law.

203.    Defendants are on notice that such claims may be asserted by Plaintiff and class members.

204. Plaintiff and class members registered for and used Facebook and Instagram and suffered injuries because of Defendants' actions in violation of these consumer protection laws.

205. Had Defendants not engaged in the deceptive conduct described herein, Plaintiff and class members would not have registered for or used Facebook and Instagram resulting in the injuries as alleged herein.

206. Fraudulent, unfair, and deceptive practices that violate consumer protection laws include:

     a.    Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

     b.    Advertising goods or service with the intent not to sell them as advertised;

     c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

     d.    Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

     e.    Many other fraudulent, unfair, and deceptive as stated elsewhere in this Complaint.

207. Plaintiff and class members were injured by Defendants' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting users including those were minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

208. Defendants have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. Defendants' deceptive, unconscionable, unfair, and fraudulent representations and

material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including:

      a.     Louisiana Revised Statutes § 51:1401

      b.     Louisiana Revised Statutes § 51:1409

209.    Under these and other consumer protection statutes, Defendants are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters, and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of Defendants are uncured or incurable and Defendants were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

210.    Plaintiff and class members justifiably relied to their detriment on Defendants' misrepresentations and omissions in deciding to use Facebook and Instagram.

Defendants violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

211. Upon information and belief, Defendants expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

212.    Upon information and belief, Defendants expressly warranted to consumers, like Plaintiff and class members, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

213.   These affirmations of fact became the basis of the bargain between Defendants and Plaintiff and class members, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

214.   As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

215.   These express communications contained misrepresentations and failed to warn Plaintiff and class members of the serious and known risks of Facebook and Instagram as alleged herein.

216.   When Defendants made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

217.   Defendants authored the documents and made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by Defendants did not conform to Defendants' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted, and fit for the ordinary purposes for which they were intended.

218.   All the aforementioned written or electronic materials are known to Defendants and in their possession, and it is Plaintiff's and class members' belief that these materials shall be produced by Defendants and made part of the record once discovery is completed.

219.    Defendants' breach of these express warranties were a substantial factor in causing Plaintiff's and class members' harms.

220.    As a direct and proximate result of Defendants' breach of these warranties, Plaintiff and members of the class suffered serious injuries and sequelae thereto.

221.    By reason of the fraudulent and unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff and class members have sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

222.    Plaintiff and the proposed class demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

223.    Plaintiff and the proposed class incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

224.    Plaintiff and the proposed class plead all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of named Plaintiff's resident State. Plaintiff and the proposed class pleads this Cause of Action under all applicable product liability acts, statutes, and laws of named Plaintiff's respective State.

225.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly

available, and benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff and class members.

226.    Defendants knew or should have known, through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

227.    Defendants knew or should have known, through the exercise of reasonable care, that minors and young people would be attracted to these products.

228.    Defendants knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff and class members in a reasonably foreseeable manner, particularly with minors and young adults.

229.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff and class members would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

230.    Defendants knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

231.    Defendants knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, or made available properly, without defects and with due care to avoid needlessly causing harm.

232.    Defendants knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

233.    Defendants knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

234.    Defendants were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff and class members, thereby causing Plaintiff and class members to suffer harm, including severe emotional distress.

235.    Defendants' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff and class members.

236.    Defendants acted with conscious and reckless disregard for the rights and interests of Plaintiff and class members, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff and class members.

237.    Based on their strategic and intentional promotion, advertising and marketing history, Defendants reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. Defendants were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention grabbing, and attention-holding, Defendants reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, Defendants should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

238.    Plaintiff and class members were injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, difficulty sleeping, among other harmful effects, which may cause or contribute to additional disease.

239.    Defendants' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers.

240. Plaintiff and the proposed class demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
## <u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

241.    Plaintiff and the proposed class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

242.    Plaintiff and the proposed pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of named Plaintiff's resident State. Plaintiff and the proposed class pleads this Cause of Action under all applicable product liability acts, statutes, and laws of named Plaintiff's respective State.

243.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff and class members.

244.    Defendants knew or should have known, through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

245.    Defendants knew or should have known, through the exercise of reasonable care, that minors and young people would be attracted to these products.

246.    Defendants knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff and class members in a reasonably foreseeable manner, particularly with minors and young adults.

247.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff and class members would not have realized the potential

risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

248.    Defendants knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

249.    Defendants knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

250.    Defendants knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

251.    Defendants knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

252.    Defendants were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff and class members, thereby causing Plaintiff and class members to suffer harm, including severe emotional distress.

253.    Defendants' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff and class members.

254.    Defendants acted with conscious and reckless disregard for the rights and interests of Plaintiff and class members, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff and class members.

255.    Based on their strategic and intentional promotion, advertising and marketing history, Defendants reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. Defendants were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention grabbing, and attention-holding, Defendants reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, Defendants should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

256.    Plaintiff and class members were injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes

attempted suicide, multiple periods of suicidal ideation, depression, difficulty sleeping, among other harmful effects, which may cause or contribute to additional disease.

257.    Plaintiff and the proposed class demand judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## MEDICAL MONITORING

258.    Plaintiff and the proposed class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

259.    Plaintiff and the proposed class plead all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of named Plaintiff's resident state. Plaintiff and the proposed class plead this Cause of Action under all applicable product liability acts, statutes, and laws of named Plaintiff's respective state.

260.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff and class members.

261.    Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

262.    According to Meta's internal research:

    a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.    Facebook makes body-image issues worse for one-third of girls;

    d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.    Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.     Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

263.    Facebook and Instagram cause harm by the following product effects:

    a.    Engagement-based ranking and intermittent variable rewards are:

        i.    highly addictive,

        ii.    promote harmful social comparison,

        iii.    promote negative, controversial, and emotionally activating content,

        iv.    promote negative, harmful, and dangerous interest groups and content creators,

        v.    encourage bullying and conflict,

vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

vii.    present a false reality (regarding one's comparative status to their peers, and the general state of world or political affairs);

b.    Face tracking and augmentation (image and video filters):

i.    inflict unrealistic and biased beauty standards upon users, and

ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success;

c.    The platforms cause the mental and physical health harms as listed above;

d.    The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

g.    The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

h.    The likelihood and intensity of these harmful effects are increased by other features and inner workings of the platforms, which are currently publicly unknown and hidden from users and governments.

264.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

265.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying, and promoting conflict, and multiplying harm in other ways.

266.    The features combine to create a user interface of endless, auto-playing, image, and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

267.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

268.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

269.     Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

270.     As a direct and proximate result of Defendants' conduct, Plaintiff and class members have developed mental and physical health issues that will require life-long monitoring treatment.

271.     As a direct and proximate result of Defendants' conduct, Plaintiff and class members have significantly increased risk of developing a serious latent disease and injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

272.     Monitoring procedures exist that make the early detection and prevention of the above technology-related or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

273.     For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse

(prescribed and non-prescribed), unemployment, and somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

274.    These procedures are different from those normally recommended in the absence of exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

275.    Plaintiff and class members have suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body have already been inflicted in its users, such as Plaintiff and class members, but the full extent of the injury will not manifest until later in Plaintiff's and class members' lives. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiff and class members be placed under periodic screening and diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff and class members have suffered due to use of these platforms.

276.    Plaintiff and the proposed class demand judgment against Defendants for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

277.    Such other relief as the Court deems proper.

## TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

278.    Through the exercise of reasonable diligence, Plaintiff and class members did not and could not have discovered that Facebook and Instagram caused her injuries and sequelae thereto because, at the time of these injuries and sequelae thereto, the cause was unknown to Plaintiff.

279.    Plaintiff and class members did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and sequelae thereto until less than the applicable limitations period prior to the filing of this action.

280.    In addition, Defendants' fraudulent concealment tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and class members the risks associated with the defects of Facebook and Instagram and that these products caused their injuries and sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, Defendants committed continual tortious and fraudulent acts.

281.    As a result of Defendants' fraudulent concealment, Plaintiff and class members were unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

Plaintiff and the proposed class pray for judgment against Defendants to the full extent of the law as reasonable in the premises, including:

1.      Entering judgment for Plaintiff and class members and against Defendants certifying a class and under the causes of action alleged herein;

2.      Entering an Order that Defendants are jointly and severally liable;

3.      Awarding damages to compensate Plaintiff and class members for injuries sustained as a result of the use of the platforms, including physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, and other economic harms that includes lost earnings and loss of earning capacity;

4.      Awarding actual and compensatory damages;

5.      Awarding statutory damages in the maximum amount permitted by law;

6.      Awarding exemplary, treble, and punitive damages where applicable;

7.      Awarding reasonable attorneys' fees;

8.      Awarding experts' fees;

9.      Awarding costs of litigation;

10.     Awarding pre-judgment and post-judgment interest at the lawful rate;

11.     A trial by jury on all issues of the case;

12.     Awarding medical monitoring costs or programs; and

13.     Any other relief as this Court may deem equitable and just, or that may be available.


Dated: July 13, 2023

                                                            Respectfully Submitted,

                                                            By  *s:/Andrew A. Lemmon*
                                                            Andrew A. Lemmon (#18302)
                                                            **Lemmon Law Firm, LLC**
                                                            5301 Canal Boulevard

Suite A
New Orleans, LA 70124
985-783-6789
985-783-1333 (fax)
andrew@lemmonlawfirm.com

**Poulin | Willey | Anastopoulo, LLC**
Paul J. Doolittle  (*Pro Hac Vice Forthcoming*)
Blake G. Abbott (*Pro Hac Vice Forthcoming*)
32 Ann Street, Charleston, SC 29403
(843) 614-8888
pauld@akimlawfirm.com
blake@akimlawfirm.com